# EXHIBIT "A"

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

MACDONALD RUDY
O'NEILL & YAMAUCHI, LLLP, LLP

**2015 APR 13  PM 4: 09**

MICHAEL D. RUDY          5105-0
CHERYL R. NG             8598-0
PAUL A. C. HIGA          9557-0
1001 Bishop Street, Suite 2350
Honolulu, Hawaii 96813
Telephone No. (808) 523-3080
Facsimile No. (808) 523-0759

H. CHING
_____
CLERK

Attorneys for Plaintiff

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| UNION LEASING CORP.,<br><br>Plaintiff,<br><br>vs.<br><br>ADMOR GROUP, INC.; ADMOR<br>DISTRIBUTORS CORP.; ADMOR<br>HVAC PRODUCTS, INC.; JOHN DOES<br>1-10, JANE DOES 1-10, DOE<br>PARTNERSHIPS, CORPORATIONS, or<br>ENTITIES 1-20,<br><br>Defendants. | CIVIL NO.  **15-1-0 6 6 8-04**  J H C<br><br><br>COMPLAINT; EXHIBITS "A"-"D";<br>SUMMONS |

I do hereby certify that this is a full, true and
correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

# EXHIBIT "A"

## COMPLAINT

Come now UNION LEASING CORP., by and through its attorneys, MacDonald Rudy

O'Neill & Yamauchi, a Limited Liability Law Partnership, LLP, who bring this Complaint for

damages and other claims against the above-named Defendants ADMOR GROUP, INC.;

ADMOR DISTRIBUTORS CORP.; ADMOR HVAC PRODUCTS, INC.; JOHN DOES 1-10,

JANE DOES 1-10, DOE PARTNERSHIPS, CORPORATIONS, or ENTITIES 1-20, and allege

as follows.

### I.    NATURE OF ACTION

1.    This action alleges various breaches of oral and written contracts to rent

warehouse space in Honolulu, Hawaii and to use trucks for business purposes.

2.    This action is brought alternatively under the equitable principle of unjust

enrichment for the recovery of rent and lease payments, plus interest.

### II.    JURISDICTION AND VENUE

3.    This Court has general jurisdiction over the civil claim asserted herein

pursuant to Hawaii Revised Statutes Section 603-21.5.

4.    Venue is proper here pursuant to Hawaii Revised Statutes Section 603-36

because the claims for relief arose in this judicial circuit and the Defendants have their principal

places of business in this judicial circuit.

### III.    PARTIES

5.    Plaintiff UNION LEASING CORP. ("Union Leasing") is and was, at all

times relevant and material herein, a corporation organized and existing under the laws of the

State of Hawaii, with its principal place of business in the City and County of Honolulu, State of

Hawaii.

1

6.    Defendant ADMOR GROUP, INC. ("Admor Group") is and was, at all times relevant and material herein, a corporation organized and existing under the laws of the State of Hawaii, with its principal place of business in the City and County of Honolulu, State of Hawaii.

7.    Defendant ADMOR DISTRIBUTORS CORP. ("Admor Distributors") is and was, at all times relevant and material herein, a corporation organized and existing under the laws of the State of Hawaii, with its principal place of business in the City and County of Honolulu, State of Hawaii.

8.    Defendant ADMOR HVAC PRODUCTS, INC. ("Admor HVAC") is and was, at all times relevant and material herein, a corporation organized and existing under the laws of the State of Hawaii, with its principal place of business in the City and County of Honolulu, State of Hawaii.

## IV.    FACTS COMMON TO ALL COUNTS

### A.    BACKGROUND

#### Related Individuals and Entities

9.    JASON CIUFO, LESLIE ANN CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Jason Ciufo Trust dated December 24, 1998 (the "Jason Trust"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

10.    JASON CIUFO, LESLIE ANN CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Jason Ciufo Family Trust dated December 24, 1998 (the "Jason Family Trust"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

2

11.     JESSICA CIUFO, JASON CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Jessica Ciufo Family Trust dated December 24, 1998 (the "Jessica Family Trust"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

12.     KENNETH CIUFO, LESLIE ANN CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Kenneth Ciufo Trust II dated December 24, 1998 (the "Kenneth Trust II"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

13.     KENNETH CIUFO, LESLIE ANN CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Kenneth Ciufo Family Trust dated December 24, 1998 (the "Kenneth Family Trust"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

14.     KENNETH CIUFO, JR., KENNETH CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Kenneth Ciufo, Jr. Family Trust dated December 24, 1998 (the "Kenneth Jr. Family Trust"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

15.     LESLIE ANN CIUFO, KENNETH CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Leslie Ann Ciufo Trust II dated December 24, 1998 (the "Leslie Trust II"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

16.     LESLIE ANN CIUFO, KENNETH CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Leslie Ann Ciufo Family Trust dated December 24, 1998 (the "Leslie

3

Family Trust"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

17.     Jason Ciufo, individually and in all of his fiduciary capacities as noted above, will be referred to hereinafter as "Jason."

18.     Jessica Ciufo, individually and in all of her fiduciary capacities as noted above, will be referred to hereinafter as "Jessica."

19.     Kenneth Ciufo, individually and in all of his fiduciary capacities as noted above, will be referred to hereinafter as "Kenneth."

20.     Kenneth Ciufo, Jr., individually and in all of his fiduciary capacities as noted above, will be referred to hereinafter as "Kenneth Jr."

21.     Leslie Ann Ciufo, individually and in all of her fiduciary capacities as noted above, will be referred to hereinafter as "Leslie."

22.     Jason, Jessica, Kenneth, Kenneth Jr., and Leslie will be referred to, collectively, hereinafter as the "Ciufos."

23.     John T. Lagnese, individually and in all of his fiduciary capacities as noted above, will be referred to hereinafter as "Lagnese."

24.     The Jason Trust, the Jason Family Trust, the Jessica Family Trust, the Kenneth Trust II, the Kenneth Family Trust, the Kenneth, Jr. Family Trust, the Leslie Trust II, and the Leslie Family Trust will be referred to, collectively, hereinafter as the "Ciufo Trusts."

25. The Ciufo Trusts have a 100% ownership interest in Union Leasing.

## The Ciufo Trusts

26.     On December 24, 1998, Leonard Ciufo ("Leonard"), father of Leslie and Kenneth, adoptive father and biological grandfather of Jason, and grandfather of Jessica and

4

Kenneth, Jr., created the Ciufo Trusts, which were all irrevocable, for the benefit of his children and grandchildren with the assistance of the Ciufo family attorney, James Starshak, Esq. ("Starshak") of Carlsmith Ball, LLP in Honolulu, Hawaii.

27. Three (3) of the eight (8) Ciufo Trusts—the Jason Trust, the Kenneth Trust II, and the Leslie Trust II (collectively, the "Mandatory Distribution Trusts")—provided for mandatory distributions of all income, at least quarterly, to its sole respective beneficiary.

28. Leonard caused Jason, Kenneth, and Leslie to be the sole settlor of their respective Mandatory Distribution Trust. While he was alive, however, Leonard served as co-trustee with each of his children for their respective Mandatory Distribution Trust.

29. The remaining five (5) of the eight (8) Ciufo Trusts—the Jason Family Trust, the Jessica Family Trust, the Kenneth Family Trust, the Kenneth Jr. Family Trust, and the Leslie Family Trust (collectively, the "Discretionary Distribution Trusts")—provided for discretionary distributions of income to its sole respective beneficiary.

30. Leonard was the settlor of the Discretionary Distribution Trusts, but he was neither a co-trustee nor a beneficiary of any of them. Thus, Leonard had no legal authority to legally participate, directly or indirectly, in the administration of the Discretionary Distribution Trusts.

31. Despite this fact, Leonard held himself out as a co-trustee and participated in the administration of the Discretionary Distribution Trusts, such that he was a de facto co-trustee in sole control of all of the Ciufo Trusts.

32. Jason, Kenneth, and Leslie were co-trustees of their respective Discretionary Distribution Trust, however, Jessica and Kenneth, Jr. were minors when the Ciufo

5

Trusts were created and could not serve as co-trustee and, therefore, were not named as co-trustees.

33.     Though Jason, Kenneth, and Leslie executed their respective Mandatory Distribution Trust as settlor and co-trustee and their respective Discretionary Distribution Trust as co-trustee, they did not understand what they were executing trust instruments and were completely unaware of the existence of the Ciufo Trusts.

34.     In fact, Jason, Kenneth, and Leslie were provided blank signature pages and were not even told they were executing trust instruments

35.     No one took the time to explain to Jason, Kenneth, and Leslie what the purpose of the documents was or what their particular rights were under the instruments.

36.     They merely executed the trusts because Leonard and Starshak told them to do so.

37.     This practice of executing complex legal documents without explanation or understanding would continue on in other trust dealings in the future.

38.     In addition to the Ciufo Trusts, on or about October 30, 1992, Leonard created a revocable trust for himself, known as the Leonard L. Ciufo Trust.

39.     With the assistance of estate planning attorney, James Starshak, Esq. of Carlsmith Ball, LLP, Leonard restated and amended the Leonard L. Ciufo Trust by executing the First Restatement of the Leonard L. Ciufo Trust dated December 28, 1998 and the First Amendment to First Restatement of the Leonard L. Ciufo Trust dated July 21, 2006 (hereinafter collectively referred to as the "Leonard Ciufo Trust").

40.     Leonard died on October 29, 2008.

6

41.     The aggregate net worth of the Ciufo Trusts was approximately forty-five million dollars ($45,000,000) as of December 31, 2011.

42.     The following table summarizes the Ciufo Trusts:

| Table 1:  Summary of the Ciufo Trusts | | | | | |
|---|---|---|---|---|---|
| Name of Trust | Date Executed | Settlor | Beneficiary | Original Trustees | Presently Serving Trustees |
| Jason Trust | 12/24/1998 | Jason | Jason | Leonard, Jason | Jason, Leslie, Lagnese |
| Jason Family Trust | 12/24/1998 | Leonard | Jason | Patrick Murphy ("Murphy"), Lori Forcucci ("Forcucci"), Jason | Jason, Leslie, Lagnese |
| Jessica Family Trust | 12/24/1998 | Leonard | Jessica | Murphy, Forcucci | Jessica, Jason, Lagnese |
| Kenneth Trust II | 12/24/1998 | Kenneth | Kenneth | Leonard, Kenneth | Kenneth, Leslie, Lagnese |
| Kenneth Family Trust | 12/24/1998 | Leonard | Kenneth | Murphy, Forcucci, Kenneth | Kenneth, Leslie, Lagnese |
| Kenneth Jr. Family Trust | 12/24/1998 | Leonard | Kenneth Jr. | Murphy, Forcucci | Kenneth, Jr., Kenneth, Lagnese |
| Leslie Trust II | 12/24/1998 | Leslie | Leslie | Leonard, Leslie | Leslie, Kenneth, Lagnese |
| Leslie Family Trust | 12/24/1998 | Leonard | Leslie | Murphy, Forcucci, Leslie | Leslie, Kenneth, Lagnese |

## The Founding of the Ciufo Companies

43.     On or about October 27, 1971, Leonard incorporated Union Leasing, under the laws of the State of Hawaii.

44.     On or about July 12, 1976, Leonard incorporated Admor Distributors under the laws of the State of Hawaii, for the purposes of wholesale and retail sale and installation of Frigidaire Refrigeration appliances.

45.     On or about March 24, 1995, Leonard incorporated Admor HVAC under the laws of the State of Hawaii for the purpose of selling commercial and residential air conditioning equipment.

46.     On or about February 15, 2000, Leonard established Ciufo Holding Co. LLC ("Ciufo Holding"), under the laws of the State of Hawaii. While Leonard was alive, Ciufo Holding's only business purpose was to serve as an investment vehicle for the Ciufo Trusts' administrative convenience of the co-trustees and the beneficiaries.

47.     On or about February 26, 2004, Leonard incorporated Admor Group for the purpose of recapitalizing Admor Distributors and Admor HVAC.

48.     Union Leasing, Admor Distributors, Admor HVAC, Ciufo Holding, and Admor Group will be referred to, collectively, hereinafter as the "Ciufo Companies."

**Control of the Ciufo Companies**

49.     The following tables show the officers and directors of the Ciufo Companies before Leonard's death (prior to 2008), after Leonard's death (2008-2014) and presently.

UNION LEASING

| Prior to 2008 | 2009-2014 | Present |
|---|---|---|
| Leonard - President, Secretary, and Director | Joanne Little ("Little") - President | Leslie - President, Treasurer, and Director |
| Kenneth - Vice President, Treasurer, and Director | Kenneth - Vice President, Treasurer, and Director | Kenneth - Vice President, Secretary, and Director |
| Leslie - Vice President and Director | Leslie - Vice President and Director | Lagnese - Assistant Secretary |
| | Georgina Fuerte ("Fuerte") - Secretary | Jason - Director |
| | Patrick Murphy ("Murphy") - Director | Jessica - Director |
| | | Kenneth Jr. - Director |

8

## ADMOR GROUP

| Prior to 2008 | 2009-2013 | 2014 | Present |
|---|---|---|---|
| Leonard - President, Secretary, and Director | Murphy - President and Director | Murphy - President and Director | Andrew Santos ("Santos") - President and Director |
| Fuerte - Vice President and Treasurer | Fuerte - Vice President, Treasurer, and Assistant Secretary | Little - Vice President and Director | Charles Young - Vice President and Director |
| | Little - Secretary | Fuerte - Secretary, Treasurer, and Director | Fuerte - Secretary, Treasurer, and Director |

## ADMOR DISTRIBUTORS

| Prior to 2008 | 2009-2012 | 2013-2014 | Present |
|---|---|---|---|
| Leonard - President, Secretary, and Director | Murphy - President | Murphy - President and Director | Fuerte - Treasurer, Secretary, and Director |
| Leslie - Vice President, Treasurer, and Director | Leslie - Vice President, Treasurer, and Director | Little - Vice President and Director | |
| | Fuerte - Secretary | Fuerte - Treasurer, Secretary, and Director | |
| | Little - Director | | |

//

//

//

//

//

//

//

9

## ADMOR HVAC

| Prior to 2008 | 2009-2013 | 2014 | Present |
|---|---|---|---|
| Andrew Santos ("Santos") - President | Andrew Santos ("Santos") - President | Andrew Santos ("Santos") - President | Santos - President |
| Fuerte - Vice President, Treasurer, and Director | Fuerte - Vice President, Treasurer, and Director | Little - Vice President and Director | Fuerte - Director |
| Leonard - Secretary and Director | Little - Secretary | Murphy - Secretary, Treasurer, and Director | |
| | Murphy - Director | Fuerte - Director | |

## CIUFO HOLDING

| Prior to 2008 | 2009-2014 | Present |
|---|---|---|
| Leonard - Manager | Little - Manager | Leslie - Manager |

50.     As evidenced in the tables above, while Leonard was alive, he solely controlled all of the Ciufo Companies as an officer, director, and/or manager of each.

51.     After Leonard's death, Murphy, Little, and Fuerte, through their trusteeship of the Ciufo Trusts, illegally inserted themselves into the Ciufo Companies without proper notice and without regard to any other corporate formalities.

52.     In fact, during these times of common control, corporate formalities were rarely, if ever, observed.

53.     The officers and directors of the Ciufo Companies failed to hold annual meetings, failed to properly document loans between the Ciufo Companies, and failed to account to the shareholders and owners of the Ciufo Companies.

54.     As a result, the Ciufos were unaware of the extent of the mismanagement of the Ciufo Companies until after they instituted their trustee removal actions against Murphy, Little, and Fuerte in 2012 (which will be discussed below).

10

55.     Presently, Admor Group, Admor Distributors, and Admor HVAC are controlled by Santos and Fuerte.

56.     At all times, then, Admor Group, Admor Distributors, and Admor HVAC have shared some form of common control and interest such that one person (Leonard) or groups of persons (Murphy, Little, Fuerte, and Santos and now, Santos and Fuerte) controlled and dictated the corporate activities of each company.[1]

57.     A corporation is imputed with constructive knowledge of the material facts known by its officers when acting in the course of employment and within the scope of his or her authority.[2]

58.     Therefore, as a result of this common control, Defendants Admor Group, Admor Distributors, and Admor HVAC were agents of each other and acted with the actual and/or apparent authority of each other and/or with the actual or constructive knowledge of each other.

59.     The acts complained of and described more fully herein were expressly or impliedly ratified by each of the Defendants Admor Group, Admor Distributors, and Admor HVAC.

60.     Therefore, the Defendants Admor Group, Admor Distributors, and Admor HVAC should be held jointly and severally liable for all awards granted by this Court to Plaintiff.

### The Trusts' Ownership of the Ciufo Companies

61.     Leonard funded each of the Ciufo Trusts, with substantial cash and stock or membership interests in Admor Group, Union Leasing, and Ciufo Holding.

---

[1] During all relevant times, Santos was the acting President of Admor HVAC.
[2] 3 Fletcher Cyc. Corp. § 790 (West 2014).

62.     Leonard, at age 68, transferred approximately 80% of his personal wealth to the Ciufo Trusts, all of which were irrevocable.

63.     By 2000, the Ciufo Trusts owned in the aggregate, 90% of Union Leasing, with the remaining 10% owned by the Leonard Ciufo Trust.

64.     By 2002, the Ciufo Trusts owned, in the aggregate, 82% of Ciufo Holding, with the remaining 18% owned by the Leonard Ciufo Trust.

65.     Leonard incorporated Admor Group in 2004 for the purpose of recapitalizing Admor Distributors and Admor HVAC, such that Admor Group became the parent company of Admor Distributors and Admor HVAC.

66.     The recapitalization allowed the Trusts to sell the Admor Group stock to the Admor employees, including Leonard, using an employee stock ownership plan (the "Admor ESOP"), which will be more fully described below.

### The Admor Group ESOP – The 2004 ESOP Transaction

67.     By 2004, the Ciufo Trusts owned, in the aggregate, 82% of Admor Group, while the Leonard Ciufo Trust owned the remaining 18%.

68.     In March 2004, Leonard began step one of a two-step process in establishing the Admor ESOP: first, the Admor ESOP purchased 49% of the Admor Group shares, which was equal to approximately 2,254,000 shares, from the Ciufo Trusts and the Leonard Ciufo Trust (the "2004 ESOP Transaction").

69.     Similar to the execution of the Ciufo Trusts in 1998, Jason, Kenneth, and Leslie were again told to sign their respective Stock Pledge Agreements and the Stock Purchase Agreement without any explanation or understanding of what they were signing and why.

12

70.     Simply put, Jason, Kenneth, and Leslie did not know that they ever owned Admor Group stocks let alone were part of an ESOP sale.

71.     This purchase was made in exchange for nine interest bearing promissory notes executed by Leonard and Murphy as the ESOP Plan Co-Administrators, as borrowers, in favor of the respective co-trustees of each of the Ciufo Trusts and the Leonard Ciufo Trust, as lenders, which together totaled the original principal amount of $5,000,000 (all nine promissory notes will be collectively hereinafter referred to as "ESOP Note 1").

72.     ESOP Note 1 was guaranteed by Admor Group and was repaid from Admor Group's business operation or redemption of the ESOP stock.

73.     ESOP Note 1 provided for an initial installment totaling approximately $73,000.00 divided proportionately among the Ciufo Trusts and the Leonard Ciufo Trust, followed by principal and interest payments to be made annually for seven years every April 15 until 2011.

74.     Commencing on April 19, 2004, however, Murphy and Leonard as Co-Plan Administrators of the Admor ESOP, and Admor Group, as guarantor, knowingly and intentionally began to make improper payments on ESOP Note 1 to Ciufo Holding, instead of the Ciufo Trusts and the Leonard Ciufo Trust.

75.     The loan payment schedules provided by the previous co-trustees show that from April 2004 through December 31, 2008, $5.382 million ($4.389 million in principal and $993,000 in interest) were impermissibly paid directly to Ciufo Holding rather than to the Ciufo Trusts and the Leonard Ciufo Trust.

13

**Additional Money Flows Back and Forth Between Admor Group and Ciufo Holding**

76.    From 2004 to 2008, Leonard used Ciufo Holding as depository for income, which was immediately due and owing to the Trusts.

77.    Ciufo Holding was improperly pooling the ESOP Note 1 payments, rental income generated from Admor Distributors and Admor HVAC's lease of the Union Leasing warehouse, and dividend income from Admor Group, as well as other distributable income from the Ciufo Companies, otherwise owed to the Ciufo Trusts.

78.    Leonard withheld these amounts from the Ciufo Trusts because Ciufo Holding served as a funding source for Admor Group, Admor Distributors, and Admor HVAC.

79.    From 2004 to 2008, Leonard, as manager of Ciufo Holding, loaned interest-free, millions of dollars, otherwise owing to the Ciufo Trusts, to Admor Group and/or its subsidiaries for its benefit without reducing said loans to writing.

80.    Leonard, as president, secretary, and director, of Admor Group, personally benefitted from these interest-free loans at the expense of the Ciufo Trusts, for which Leonard serve as a de jure and de facto co-trustee.

81.    Payments on these loans were sporadically made, but a balance remains when interest at the statutory rate of 10% per year is applied.

82.    Ciufo Holding seeks repayment of these loans, plus interest, on the principal, which should have properly been distributed to the Ciufo Trusts.

**The Admor Group ESOP – The 2007 ESOP Transaction**

83.    In 2007, the second step of the Admor ESOP process took place.

84.    The remaining Admor shares in the Jason Family Trust, Kenneth Family Trust and Leslie Family Trust were transferred to their Mandatory Distribution Trust counterpart.

14

85.     Then, on October 25, 2007, the Mandatory Distribution Trusts, the Jessica Family Trust, and the Kenneth, Jr. Family Trust sold their remaining 1,994,857 common non-voting shares of Admor Group to the Admor ESOP for a purchase price of $8,936,961 (the "2007 ESOP Transaction").

86.     To facilitate the 2007 ESOP Transaction, Admor Group loaned the $8,936,961 purchase price to the Admor ESOP.

87.     Precisely $8,500,000 of the purchase price, however, was loaned by Ciufo Holding to Admor Group, as evidenced by a ten-year interest bearing promissory note in the original principal amount of $8,500,000 dated November 9, 2007, executed by Leonard, as President of Ciufo Holding (lender) and as President of Admor Group (borrower) ("ESOP Note 2").

88.     As stated previously, Ciufo Holding was collecting the principal and interest payments from ESOP Note 1 that should have properly been paid to the Ciufo Trusts and the Leonard Ciufo Trust.

89.     Of the ESOP Note 1 money diverted to Ciufo Holding, $4.575 million of the Ciufo Trusts' money was transferred back to Admor Group, which was then used to pay the Ciufo Trusts for the 2007 ESOP Transaction.

90.     It was further discovered in mid-2013 that Ciufo Holding was also improperly pooling and withholding Ciufo Trust income from other sources, including, but not limited to Union Leasing rental income, other Admor Group income, and Ciufo Holding investment income.

15

91. Therefore, the majority of the $8,500,000 loaned by Ciufo Holding to Admor Group and then later by Admor Group to the Admor ESOP to purchase the remaining shares was largely comprised of the Ciufo Trusts' own income.

92. Essentially, then, the Admor ESOP purchased the remaining Admor Group shares of the Mandatory Distribution Trusts, the Jessica Family Trust, and the Kenneth, Jr. Family Trust with these trusts' own money.

93. Unlike the 2004 ESOP Transaction, Leonard did not have Jason, Kenneth, or Leslie sign any of the documents in the 2007 ESOP Transaction.

94. The 2007 ESOP Transaction was completed entirely by Leonard, without the knowledge or consent of the Ciufos; and, in fact, Leonard was the only one to sign almost all of the documents.[3]

95. Leonard executed these various documents to complete the 2007 ESOP Transaction in the following capacities:

        a.  As president and secretary of Admor Group;

        b.  As trustee of the Admor ESOP;

        c.  As president of Ciufo Holding;

        d.  As co-trustee of the Jason Trust;

        e.  As co-trustee of the Kenneth Trust II;

        f.  As co-trustee of the Leslie Trust II;

        g.  As co-trustee of the Jessica Family Trust; and

        h.  As co-trustee of the Kenneth Jr. Family Trust.

---

[3] Only one other document was executed by Patrick Murphy, Georgina Fuerte, and Liberato Saquing as ESOP Committee Members.

16

96.     The most alarming aspect of the 2007 ESOP Transaction is that Leonard was not actually a co-trustee of either the Jessica Family Trust or the Kenneth Jr. Family Trust when their respective remaining shares were sold to the Admor ESOP.

## Information Regarding the Ciufo Trusts and the Ciufo Companies Is Withheld from the Ciufos

97.     Prior to Leonard's death, the Ciufos did not know anything about the Ciufo Trusts, despite the fact that Jason, Kenneth, and Leslie were co-trustees of their respective trusts.

98.     From the Ciufo Trusts' inception to Leonard's death, Jason, Kenneth, and Leslie were told merely to sign various documents as co-trustee, without any explanation as to what the documents were or what they meant.

99.     At the time the Ciufo Trusts were executed, Jessica and Kenneth Jr. were minors and could not serve as co-trustees and during all other relevant times Jessica and Kenneth Jr. were minors, so they were not asked or required to sign any documents.

100.    After Leonard's death, the Ciufos were given very little additional information on their respective Ciufo Trusts until late 2012 when information was obtained in the litigation's discovery process.

101.    The Ciufos knew nothing about the Ciufo Trusts or its assets, including their respective interests in the Ciufo Companies.

102.    Murphy, a friend of Leonard's, who served as a co-trustee of the Discretionary Distribution Trusts from their inception, also became a co-trustee of the Mandatory Distribution Trusts upon the death of Leonard.

103.    Fuerte, Leonard's long-time bookkeeper for the Ciufo Companies, and Little, a distant relative of Leonard's deceased wife, also became co-trustees of the Discretionary

17

Distribution Trusts in April of 2002 and the Mandatory Distribution Trusts upon the death of Leonard.

104.     The Ciufos struggled to obtain information from Murphy, Little, Fuerte, and Starshak.

105.     Murphy, Little, and Fuerte, as co-trustees of the Ciufo Trusts, never provided the Ciufos with a complete accounting of their respective Trust assets.

106.     Furthermore, the Ciufos were also not properly kept apprised of the business dealings of the Ciufo Companies, despite the fact that Kenneth and Leslie were officers and directors of some of them during Leonard's lifetime.

107.     As mentioned previously, after Leonard's death, Murphy, Little, and Fuerte inserted themselves into the various Ciufo Companies by voting themselves in as officers and directors by virtue of the shares they held in the Ciufo Companies as co-trustees of the various Ciufo Trusts, without any formal shareholder meeting.

108.     Sensing that they needed help, the Ciufos sought the guidance and advice of their uncle, Lagnese, and, eventually, obtained legal counsel.

109.     First, a proceeding regarding the Leonard Ciufo Trust was opened to determine how the residuary trust estate should be distributed.

110.     Pursuant to sections 5.03 and 5.04 of the Leonard Ciufo Trust, the Discretionary Distribution Trusts were the beneficiaries of the residuary trust estate of the Leonard Ciufo Trust.

111.     Pursuant to an Order of the Probate Court of the First Circuit State of Hawaii filed August 18, 2011 in the case entitled, _In the Matter of the Leonard L. Ciufo Trust Dated October 30, 1992, Restated December 31, 1998, as Amended July 12, 2006_, T. No. 09-1-

18

0748 (the "Court Order"), the residuary trust estate was to be distributed amongst the Discretionary Distribution Trusts in equal shares.

112. By December 31, 2011, the 18% of the stock of Ciufo Holding, the 10% of the issued stock in Union Leasing, and 8% of the stock of Admor Group, all previously owned by the Leonard Ciufo Trust, were distributed in equal shares to the Discretionary Distribution Trusts, pursuant to the Court Order.

113. Thus, the Ciufo Trusts now own 100% of the membership interests in Ciufo Holding and 100% of the outstanding stock of Union Leasing.

114. The Discretionary Distribution Trusts own the remaining approximate 8% of shares in Admor Group, not owned by the Admor ESOP.

115. The Ciufo Trusts ownership interests in Union Leasing, Ciufo Holding, and Admor Group, as of 2011, following the Court Order are as follows:

| Table 2: Ciufo Companies Shareholder Ownership Interests as of 2011 (Rounded) | | | |
|---|---|---|---|
| | Union Leasing | Ciufo Holding | Admor Stock |
| Leslie Ciufo Trust | 24% | 22% | 0% |
| Leslie Family Trust | 4% | 7% | 1.6% |
| Kenneth Ciufo Trust | 34% | 24% | 0% |
| Kenneth Family Trust | 4% | 6% | 1.6% |
| Jason Ciufo Trust | 9% | 9% | 0% |
| Jason Family Trust | 4% | 6% | 1.6% |
| Jessica Family Trust | 13% | 15% | 1.6% |
| Kenneth Jr. Family Trust | 8% | 11% | 1.6% |
| Total | 100% | 100% | 8.0% |

19

116. Eventually, the Ciufos discovered various breaches of fiduciary duty by Murphy, Little, and Fuerte and filed petitions for each Ciufo Trust to remove them as co-trustees in August 2012 in the probate court of the First Circuit Court, State of Hawaii.

117. As a result of the petitions, Murphy, Little, and Fuerte removed Kenneth and Leslie as officers and directors without proper notice to Kenneth and Leslie.

118. Furthermore, it was only through the discovery process of the litigation, from 2013 to 2014, that Lagnese was able to piece together the various transactions between the Ciufo Trusts and the Ciufo Companies, as described above.

119. After years of litigation, the parties settled the lawsuit resulting in Murphy, Little, and Fuerte resigning as co-trustees of the Ciufo Trusts and the Ciufos and Lagnese becoming co-trustees as set forth in Table 1 above and officers and directors of Union Leasing as set forth in the table above.

### Rent and Truck Lease Payments Due to Union Leasing

120. Union Leasing owns the warehouse located at 2219 Alahao Place, Honolulu, Hawaii 96819, TMK No. (1) 1-2-021-033 (the "Premises").

121. Admor Distributors has rented the Premises since approximately 1982.

122. Admor HVAC has rented the Premises since approximately 1995.

123. From these dates through 2009, Admor Distributors and Admor HVAC rented the Premises through an oral month-to-month tenancy arrangement with Union Leasing.

124. On or about January 4, 2010, Union Leasing, as landlord, and Admor Distributors, as tenant, entered into a lease for the term from January 4, 2010 to December 31,

20

2010 (the "2010 Admor Distributors Lease"). A true copy of the 2010 Admor Distributors Lease is attached hereto **Exhibit "A"** and made a part hereof. [4]

125. On or about February 8, 2010, Union Leasing, as landlord, and Admor Distributors, as tenant, entered into a lease for the term from January 1, 2011 to December 31, 2011 (the "2011 Admor Distributors Lease"). A true copy of the 2011 Admor Distributors Lease is attached hereto **Exhibit "B"** and made a part hereof. (The 2010 Admor Distributors Lease and the 2011 Admor Distributors Lease will be collectively referred to hereinafter as the "Admor Distributors Leases.")

126. The Admor Distributors Leases were executed by Little, as President of Union Leasing, and Murphy, as President of Admor Distributors.

127. In 2010, when the Admor Distributors Leases were executed, Little was also the Vice President, Treasurer, and a Director, while Murphy was a Director of Union Leasing.

128. Thus, the Admor Distributors Leases were not arms-length transactions as the same parties were on both sides of the transaction.

129. This is further evidenced by the unexplained decrease in rental amounts between the 2010 Admor Distributors Lease and the 2011 Admor Distributors Lease.

130. On or about January 4, 2010, Union Leasing, as landlord, and Admor HVAC, as tenant, entered into a lease for the term from January 4, 2010 to December 31, 2010 (the "2010 Admor HVAC Lease"). A true copy of the 2010 Admor HVAC Lease is attached hereto **Exhibit "C"** and made a part hereof.

---

[4] Please note, all written leases describe a property address of 2225 Hoonee Place because the portion of the Premises rented by Admor Distributors and Admor HVAC are located on the side fronting Hoonee Place.

131. On or about February 8, 2010, Union Leasing, as landlord, and Admor HVAC, as tenant, entered into a lease for the term from January 1, 2011 to December 31, 2011 (the "2011 Admor HVAC Lease"). A true copy of the 2011 Admor HVAC Lease is attached hereto **Exhibit "D"** and made a part hereof. (The 2010 Admor HVAC Lease and the 2011 Admor HVAC Lease will be collectively referred to hereinafter as the "Admor HVAC Leases.")

132. The Admor HVAC Leases were executed by Little, as President of Union Leasing, and Santos, as President of Admor HVAC.

133. When the Admor HVAC Leases were executed in 2010, Little was also the Secretary of Admor HVAC.

134. Therefore, the Admor HVAC Leases were also not arms-length transactions.

135. Additionally, similar to the Admor Distributors Leases, there was a decrease in rent from the 2010 Admor HVAC Lease to the 2011 Admor HVAC Lease.

136. From 2012 to present, neither Admor Distributors nor Admor HVAC executed another written lease with Union Leasing.

137. Thus, pursuant to the 2011 Admor Distributors Lease and the 2011 Admor HVAC Lease, Admor Distributors and Admor HVAC each have a month-to-month tenancy with Union Leasing under the same terms as the 2011 Admor Distributors Lease and the 2011 Admor HVAC Lease, respectively.

138. In addition to renting a section of the Premises, Union Leasing and Admor HVAC have an oral agreement in which Admor HVAC would be permitted to use trucks owned by Union Leasing in its regular business activities for $3,000 a month.

22

139.     These trucks pick up and deliver heavy air conditioning equipment from the docks, in pallet form, and they are either stored in the warehouses or directly sent to buyers at various contract sites.

140.     Union Leasing and Admor HVAC have been operating under this oral agreement since approximately 2006.

141.     As part of the settlement mentioned above, in late 2014, Murphy, Little, and Fuerte resigned from their respective positions in Union Leasing and the Ciufos and Lagnese began to take control of the company.

142.     Shortly thereafter, Lagnese, as Assistant Secretary, began reviewing the books and records of Union Leasing in which he discovered that due to Admor Distributors and Admor HVAC's late payments or non-payments since 2008, Admor Distributors and Admor HVAC have significant balances due to Union Leasing.

143.     Furthermore, in early 2015, Fuerte, the previous secretary of Union Leasing and current officer and director of Admor Group, Admor Distributors, and Admor HVAC, provided Lagnese with a ledger related to the equipment lease payments and indicated that all equipment lease payments were current, but upon careful review Lagnese could not find cash receipts, reflecting these payments.

144.     After his review of these ledgers, Lagnese discovered that the truck lease payments were not being made by Admor HVAC.

145.     On or about January 27, 2015, Lagnese questioned Fuerte about these non-payments and Fuerte admitted that Admor HVAC has not paid the monthly truck lease payments since May 2010.

23

146.    On or about January 30, 2015, Plaintiff, through undersigned counsel, sent a letter to counsel for Admor Group, Inc. about the back rent, late fees, and interest that were owed by Admor Distributors and Admor HVAC for period 2008-2014.

147.    On or about February 3, 2015, Lagnese, as Assistant Controller of Union Leasing, sent another letter to Santos, President of Admor HVAC, and Fuerte, Secretary, Treasurer, and Director of Admor Distributors and Director of Admor HVAC.

148.    Lagnese's February 3, 2015 letter offered new terms for the month-to-month tenancy at a total rental amount of $53,400 per month, beginning on March 1, 2015 and advised that if the offer was not accepted, Admor Distributors and Admor HVAC needed to vacate the premises on or before March 31, 2015.

149.    On March 19, 2015, Santos, on behalf of Admor Distributors and Admor HVAC, informed Lagnese that the companies would be vacating the Premises on June 17, 2015.

## V.    CAUSES OF ACTION

### COUNT I – BREACH OF ORAL CONTRACT
(AS TO ALL DEFENDANTS - ADMOR DISTRIBUTORS' FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY INTEREST FROM 2008-2009)

150.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 149 of the Complaint as though fully set forth herein.

151.    Hawaii Revised Statutes Section 666-2 provides, "Notwithstanding other provisions of law to the contrary, when real property is rented for an indefinite time with monthly or other periodic rent reserved, such holding shall be construed to be a tenancy from month to month, or from period to period on which rent is payable."

152.    From approximately 1982-present, Admor Distributors has occupied a portion of the Premises as its principal place of business.

24

153.    From 2008-2009, Union Leasing and Admor Distributors had an oral agreement to pay rent in the amount of $6,865 on a monthly basis and, therefore, had an oral month-to-month tenancy agreement pursuant to HRS § 666-2.

154.    During the period 2008-2009, Admor Distributors failed to make timely payments in nine (9) of the twenty-four (24) months.

155.    Admor Distributors' failure to timely pay the agreed upon rent is a breach of the oral contract.

156.    During the period 2008-2009, both Union Leasing and Admor Distributors were controlled by Murphy, Little, and Fuerte.

157.    Therefore, the then-serving officers of Union Leasing did not properly pursue timely payment of rent as a typical lessor would have done in a normal arms-length landlord-tenant situation.

158.    As a result of these late payments, Union Leasing is entitled to damages, including interest at the statutory rate of 10% per year pursuant to HRS § 478-2, in an amount to be proven at trial.

159.    Defendants Admor Group, Admor Distributors, and Admor HVAC should be jointly and severally liable for said damages because of their common control and interest.

## COUNT II – UNJUST ENRICHMENT
(AS TO ALL DEFENDANTS - ADMOR DISTRIBUTORS' FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY INTEREST FROM 2008-2009)

160.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 159 of the Complaint as though fully set forth herein.

161.    Alternatively, Union Leasing is entitled to recover damages under the theory of unjust enrichment.

25

162.   "One who receives a benefit is of course enriched, and he would be unjustly enriched if its retention would be unjust. And it is axiomatic that 'a person who has been unjustly enriched at the expense of another is required to make restitution to the other.'" Small v. Badenhop, 67 Haw. 626, 636, 701 P.2d 647, 654 (1985).

163.   Admor Distributors' failure to make timely payments resulted in a benefit to Admor Distributors to the detriment of Union Leasing.

164.   From 2008-2009, Admor Distributors enjoyed the use of the Premises without making proper and timely payment of rent for nine (9) of the twenty-four (24) months to Union Leasing.

165.   As a result of these late payments, Union Leasing is entitled to damages, including interest at the statutory rate of 10% per year pursuant to HRS § 478-2, in an amount to be proven at trial.

166.   Defendants Admor Group, Admor Distributors, and Admor HVAC should be jointly and severally liable for said damages because of their common control and interest.

**COUNT III – BREACH OF CONTRACT**
(AS TO ALL DEFENDANTS - ADMOR DISTRIBUTORS' FAILURE TO PAY RENT,
FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY LATE PENALTIES AND
INTEREST IN 2010)

167.   Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 166 of the Complaint as though fully set forth herein.

168.   On or about January 4, 2010, Union Leasing, as landlord, and Admor Distributors, as tenants, entered into the 2010 Admor Distributors Lease. *See* **Exhibit "A."**

169.   Pursuant to the 2010 Admor Distributors Lease, Admor Distributors agreed to pay monthly rent in the amount of $6,865 from January – December 2010. *Id*. at ¶¶ 2 and 3.

170.    The 2010 Admor Distributors Lease provided for a five percent (5%) late charge if rental payment is not made within five (5) days of its due date. *Id*. at ¶ 2.

171.    The 2010 Admor Distributors Lease was not an arms-length transaction.

172.    It was executed by Little as President of Union Leasing (who was also a director of Admor Distributors) and Murphy as President of Admor Distributors (who was also a director of Union Leasing).

173.    The 2010 Admor Distributors Lease was also created from a simple form and the parties filled in many of the blanks with "N/A."

174.    During the term of the 2010 Admor Distributors Lease, Admor Distributors failed to make timely payments in two (2) of the twelve (12) months.

175.    Because Union Leasing and Admor Distributors were under common control in 2010, the then-serving officers of Union Leasing did not properly pursue timely payment of rent or the 5% late penalty as was its right under the 2010 Admor Distributors Lease, as a typical lessor would have done in a normal arms-length landlord-tenant situation.

176.    Thus, Admor Distributors' failure to make timely payments resulted in the accrual of late penalties that have not been paid by Admor Distributors.

177.    Furthermore, though the 2010 Admor Distributors Lease provided for monthly rent in the amount of $6,865, Admor Distributors began paying $6,521.75 in May 2010, resulting in a balance of $3,089.25 in rent due by the end of the year.

178.    Union Leasing is also entitled to interest on the delayed and unpaid rent amounts at the statutory rate of 10% per year pursuant to HRS § 478-2.

179.    Admor Distributors' failure to timely pay the agreed upon rent in full and failure to pay the late penalty are breaches of the 2010 Admor Distributors Lease and as a result

27

of these breaches, Union Leasing is entitled to damages, including interest at the statutory rate, in

an amount to be proven at trial.

180.    Defendants Admor Group, Admor Distributors, and Admor HVAC should

be jointly and severally liable for said damages because of their common control and interest.

## COUNT IV – UNJUST ENRICHMENT
### (AS TO ALL DEFENDANTS - ADMOR DISTRIBUTORS' FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY LATE PENALTIES AND INTEREST IN 2010)

181.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs

1 through 180 of the Complaint as though fully set forth herein.

182.    Alternatively, Union Leasing is entitled to recover damages under the

theory of unjust enrichment.

183.    Admor Distributors' failure to make timely payments and failure to pay

rent in full resulted in a benefit to Admor Distributors to the detriment of Union Leasing.

184.    In 2010, Admor Distributors enjoyed the use of the Premises without

making timely payment of rent for two (2) of the twelve (12) months and without making full

payment of rent in eight (8) of the twelve (12) months.

185.    As a result of these late and deficient payments, Union Leasing is entitled

to damages, including interest at the statutory rate, in an amount to be proven at trial.

186.    Defendants Admor Group, Admor Distributors, and Admor HVAC should

be jointly and severally liable for said damages because of their common control and interest.

## COUNT V – BREACH OF CONTRACT
### (AS TO ALL DEFENDANTS - ADMOR DISTRIBUTORS' FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY LATE PENALTIES AND INTEREST IN 2011)

28

187.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 186 of the Complaint as though fully set forth herein.

188.    On or about February 8, 2010, Union Leasing, as landlord, and Admor Distributors, as tenants, entered into the 2011 Admor Distributors Lease. *See* **Exhibit "B."**

189.    Pursuant to the 2011 Admor Distributors Lease, Admor Distributors agreed to pay monthly rent in the amount of $6,521.75 from January – December 2011. *Id.* at ¶¶ 2 and 3.

190.    The 2011 Admor Distributors Lease also provided for a five percent (5%) late charge if rental payment is not made within five (5) days of its due date. *Id.* at ¶ 2.

191.    The 2011 Admor Distributors Lease was also not an arms-length transaction and suffered the same defects of the 2010 Admor Distributors Lease.

192.    During the term of the 2011 Admor Distributors Lease, Admor Distributors failed to make timely payments in five (5) of the twelve (12) months and failed to pay rent for one (1) month, resulting in a balance of $6,521.75 in rent due by the end of the year.

193.    Because Union Leasing and Admor Distributors were under common control in 2011, the then-serving officers of Union Leasing did not properly pursue timely payment of rent or the 5% late penalty as was its right under the 2011 Admor Distributors Lease, as a typical lessor would have done in a normal arms-length landlord-tenant situation.

194.    Admor Distributors' failure to make timely payments resulted in the accrual of late penalties that have not been paid by Admor Distributors.

195.    Union Leasing is also entitled to interest on the delayed and unpaid rent amounts at the statutory rate of 10% per year pursuant to HRS § 478-2.

196. Admor Distributors' failure to timely pay the agreed upon rent in full and failure to pay the late penalty are breaches of the 2011 Admor Distributors Lease and as a result of these breaches, Union Leasing is entitled to damages, including interest at the statutory rate, in an amount to be proven at trial.

197. Defendants Admor Group, Admor Distributors, and Admor HVAC should be jointly and severally liable for said damages because of their common control and interest.

## COUNT VI – UNJUST ENRICHMENT
### (AS TO ALL DEFENDANTS - ADMOR DISTRIBUTORS' FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY LATE PENALTIES AND INTEREST IN 2011)

198. Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 197 of the Complaint as though fully set forth herein.

199. Alternatively, Union Leasing is entitled to recover damages under the theory of unjust enrichment.

200. Admor Distributors' failure to make timely payments and failure to pay rent in full resulted in a benefit to Admor Distributors to the detriment of Union Leasing.

201. In 2011, Admor Distributors enjoyed the use of the Premises without making timely payment of rent for five (5) of the twelve (12) months and without making full payment of rent in one (1) of the twelve (12) months.

202. As a result of these late and deficient payments, Union Leasing is entitled to damages, including interest at the statutory rate, in an amount to be proven at trial.

203. Defendants Admor Group, Admor Distributors, and Admor HVAC should be jointly and severally liable for said damages because of their common control and interest.

## COUNT VII – BREACH OF CONTRACT

30

(AS TO ALL DEFENDANTS - ADMOR DISTRIBUTORS' FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY LATE PENALTIES AND INTEREST FROM 2012-2014)

204.     Plaintiff repeats and realleges all of the allegations set forth in paragraphs

1 through 203 of the Complaint as though fully set forth herein.

205.     From 2012-present, Union Leasing and Admor Distributors did not

execute any additional written leases.

206.     Thus, pursuant to the 2011 Admor Distributors Lease, Admor Distributors

and Union Leasing had a month-to-month tenancy under the same terms as the 2011 Admor

Distributors Lease. *See* **Exhibit "B"** at ¶ 3.

207.     During the period 2012-2014, Admor Distributors further failed to make

timely payments in eleven (11) of the thirty-six (36) months.

208.     Admor Distributors' failure to timely pay the agreed upon rent is a breach

of the oral contract and as a result, Union Leasing is entitled to damages, including interest at the

statutory rate, in an amount to be proven at trial.

209.     Defendants Admor Group, Admor Distributors, and Admor HVAC should

be jointly and severally liable for said damages because of their common control and interest.

**COUNT VIII – UNJUST ENRICHMENT**
(AS TO ALL DEFENDANTS - ADMOR DISTRIBUTORS' FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY LATE PENALTIES AND INTEREST FROM 2012-2014)

210.     Plaintiff repeats and realleges all of the allegations set forth in paragraphs

1 through 209 of the Complaint as though fully set forth herein.

211.     Alternatively, Union Leasing is entitled to recover damages under the

theory of unjust enrichment.

212.    Admor Distributors' failure to make timely payments resulted in a benefit

to Admor Distributors to the detriment of Union Leasing.

213.    From 2012-2014, Admor Distributors enjoyed the use of the Premises

without making timely payment of rent in eleven (11) of the thirty-six (36) months.

214.    As a result of these late and deficient payments, Union Leasing is entitled

to damages, including interest at the statutory rate, in an amount to be proven at trial.

215.    Defendants Admor Group, Admor Distributors, and Admor HVAC should

be jointly and severally liable for said damages because of their common control and interest.

### COUNT IX – BREACH OF ORAL CONTRACT
(AS TO ALL DEFENDANTS - ADMOR HVAC'S FAILURE TO PAY RENT, FAILURE TO
PAY RENT TIMELY, AND/OR FAILURE TO PAY INTEREST FROM 2008-2009)

216.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs

1 through 215 of the Complaint as though fully set forth herein.

217.    From approximately 1995-present, Admor HVAC has occupied a separate

portion of the Premises as its principal place of business.

218.    From 2008-2009, Union Leasing and Admor HVAC had an oral

agreement to pay rent in the amount of $38,900 on a monthly basis and, therefore, had an oral

month-to-month tenancy agreement pursuant to HRS § 666-2.

219.    During the period 2008-2009, Admor HVAC failed to make timely

payments in fifteen (15) of the twenty-four (24) months.

220.    During the period 2008-2009, both Union Leasing and Admor HVAC

were controlled by Murphy, Little, and Fuerte.

32

221.    Therefore, the then-serving officers of Union Leasing did not properly pursue timely payment of rent as a typical lessor would have done in a normal arms-length landlord-tenant situation.

222.    As a result of these late payments, Union Leasing is entitled to damages, including interest at the statutory rate, in an amount to be proven at trial.

223.    Defendants Admor Group, Admor Distributors, and Admor HVAC should be jointly and severally liable because of their common control and interest.

## COUNT X – UNJUST ENRICHMENT
(AS TO ALL DEFENDANTS - ADMOR HVAC'S FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY INTEREST FROM 2008-2009)

224.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 223 of the Complaint as though fully set forth herein.

225.    Alternatively, Union Leasing is entitled to recover damages under the theory of unjust enrichment.

226.    Admor HVAC's failure to make timely payments resulted in a benefit to Admor HVAC to the detriment of Union Leasing.

227.    From 2008-2009, Admor HVAC enjoyed the use of the Premises without making timely payment of rent fifteen (15) of the twenty-four (24) months to Union Leasing.

228.    As a result of these late payments, Union Leasing is entitled to damages, including interest at the statutory rate, in an amount to be proven at trial.

229.    Defendants Admor Group, Admor Distributors, and Admor HVAC should be jointly and severally liable for said damages because of their common control and interest.

## COUNT XI – BREACH OF CONTRACT
(AS TO ALL DEFENDANTS - ADMOR HVAC'S FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY LATE PENALTIES AND INTEREST IN 2010)

33

230.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 229 of the Complaint as though fully set forth herein.

231.    On or about January 4, 2010, Union Leasing, as landlord, and Admor HVAC, as tenants, entered into the 2010 Admor HVAC Lease. *See* **Exhibit "C."**

232.    Pursuant to the 2010 Admor HVAC Lease, Admor HVAC agreed to pay monthly rent in the amount of $38,900 from January – December 2010. *Id*. at ¶¶ 2 and 3.

233.    The 2010 Admor HVAC Lease provided for a five percent (5%) late charge if rental payment is not made within five (5) days of its due date. *Id*. at ¶ 2.

234.    The 2010 Admor HVAC Lease was not an arms-length transaction.

235.    It was executed by Little as President of Union Leasing (who was also the Secretary of Admor HVAC) and Santos as President of Admor HVAC.

236.    The 2010 Admor Distributors Lease was also created from a simple form and the parties filled in many of the blanks with "N/A."

237.    During the term of the 2010 Admor HVAC Lease, Admor HVAC failed to make timely payments in seven (7) of the twelve (12) months.

238.    Because Union Leasing and Admor HVAC were under common control in 2010, the then-serving officers of Union Leasing did not properly pursue timely payment of rent or the 5% late penalty as was its right under the 2010 Admor HVAC Lease, as a typical lessor would have done in a normal arms-length landlord-tenant situation.

239.    Thus, Admor HVAC's failure to make timely payments resulted in the accrual of late penalties that have not been paid by Admor HVAC.

34

240.  Furthermore, though the 2010 Admor HVAC Lease provided for monthly rent in the amount of $38,900, Admor HVAC began paying $36,955 during the second half of the year, resulting in a balance of $26,710 in rent due by the end of the year.

241.  Admor HVAC's failure to timely pay the agreed upon rent in full and failure to pay the late penalty are breaches of the 2010 Admor HVAC Lease and as a result of these breaches, Union Leasing is entitled to damages, including interest at the statutory rate, in an amount to be proven at trial.

242.  Defendants Admor Group, Admor Distributors, and Admor HVAC should be jointly and severally liable for said damages because of their common control and interest.

### COUNT XII – UNJUST ENRICHMENT
(AS TO ALL DEFENDANTS - ADMOR HVAC'S FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY LATE PENALTIES AND INTEREST IN 2010)

243.  Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 242 of the Complaint as though fully set forth herein.

244.  Alternatively, Union Leasing is entitled to recover damages under the theory of unjust enrichment.

245.  Admor Distributors' failure to make timely payments and failure to pay rent in full resulted in a benefit to Admor Distributors to the detriment of Union Leasing.

246.  In 2010, Admor Distributors enjoyed the use of the Premises without making timely payment of rent for seven (7) of the twelve (12) months and without making full payment of rent resulting in an outstanding balance of $26,710.00 by the end of the year.

247.  As a result of these late and deficient payments, Union Leasing is entitled to damages, including interest at the statutory rate, in an amount to be proven at trial.

35

248. Defendants Admor Group, Admor Distributors, and Admor HVAC should be jointly and severally liable for said damages because of their common control and interest.

## COUNT XIII – BREACH OF CONTRACT
(AS TO ALL DEFENDANTS - ADMOR HVAC'S FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY LATE PENALTIES AND INTEREST IN 2011)

249. Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 248 of the Complaint as though fully set forth herein.

250. On or about February 8, 2010, Union Leasing, as landlord, and Admor HVAC, as tenants, entered into the 2011 Admor HVAC Lease. *See* **Exhibit "D."**

251. Pursuant to the 2011 Admor HVAC Lease, Admor HVAC agreed to pay monthly rent in the amount of $36,955 from January – December 2011. *Id*. at ¶¶ 2 and 3.

252. The 2011 Admor HVAC Lease also provided for a five percent (5%) late charge if rental payment is not made within five (5) days of its due date. *Id*. at ¶ 2.

253. The 2011 Admor HVAC Lease was also not an arms-length transaction and suffered the same defects of the 2010 Admor HVAC Lease.

254. During the term of the 2011 Admor HVAC Lease, Admor HVAC failed to make timely payments in seven (7) of the twelve (12) months and failed to pay rent for five (5) of the twelve (12) months, resulting in a balance of $184,775.00 in rent due by the end of the year.

255. Because Union Leasing and Admor HVAC were under common control in 2011, the then-serving officers of Union Leasing did not properly pursue timely payment of rent in full or the 5% late penalty as was its right under the 2011 Admor HVAC Lease, as a typical lessor would have done in a normal arms-length landlord-tenant situation.

36

256.     Admor HVAC's failure to make timely payments resulted in the accrual of

late penalties that have not been paid by Admor HVAC.

257.     Admor HVAC's failure to timely pay the agreed upon rent in full and

failure to pay the late penalty are breaches of the 2011 Admor HVAC Lease and as a result of

these breaches, Union Leasing is entitled to damages, including interest at the statutory rate, in

an amount to be proven at trial.

258.     Defendants Admor Group, Admor Distributors, and Admor HVAC should

be jointly and severally liable for said damages because of their common control and interest.

## COUNT XIV – UNJUST ENRICHMENT
(AS TO ALL DEFENDANTS - ADMOR HVAC'S FAILURE TO PAY RENT, FAILURE TO
PAY RENT TIMELY, AND/OR FAILURE TO PAY LATE PENALTIES AND INTEREST IN
2011)

259.     Plaintiff repeats and realleges all of the allegations set forth in paragraphs

1 through 258 of the Complaint as though fully set forth herein.

260.     Alternatively, Union Leasing is entitled to recover damages under the

theory of unjust enrichment.

261.     Admor HVAC's failure to make timely payments and failure to pay rent in

full resulted in a benefit to Admor HVAC to the detriment of Union Leasing.

262.     In 2011, Admor HVAC enjoyed the use of the Premises without making

timely payment of rent for seven (7) of the twelve (12) months and failed to pay rent for five (5)

of the twelve (12) months.

263.     As a result of these late and deficient payments, Union Leasing is entitled

to damages, including interest at the statutory rate, in an amount to be proven at trial.

264.     Defendants Admor Group, Admor Distributors, and Admor HVAC should

be jointly and severally liable for said damages because of their common control and interest.

37

## COUNT XV – BREACH OF ORAL CONTRACT
(AS TO ALL DEFENDANTS - ADMOR HVAC'S FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY LATE PENALTIES AND INTEREST FROM 2012-2014)

265.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 264 of the Complaint as though fully set forth herein.

266.    From 2012-present, Union Leasing and Admor HVAC did not execute any additional written leases.

267.    Thus, pursuant to the 2011 Admor HVAC Lease, Admor HVAC and Union Leasing had a month-to-month tenancy under the same terms as the 2011 Admor HVAC Lease. *See* **Exhibit "D"** at ¶ 3.

268.    During the period 2012-2014, Admor HVAC further failed to make timely payments in twenty-one (21) of the thirty-six (36) months.

269.    Admor HVAC's failure to make timely payments resulted in the accrual of late penalties that have not been paid by Admor HVAC.

270.    Admor HVAC's failure to timely pay the agreed upon rent and failure to pay the late penalty are breaches of the oral contract and as a result of these breaches, Union Leasing is entitled to damages, including interest at the statutory rate, in an amount to be proven at trial.

271.    Defendants Admor Group, Admor Distributors, and Admor HVAC should be jointly and severally liable for said damages because of their common control and interest.

## COUNT XVI – UNJUST ENRICHMENT
(AS TO ALL DEFENDANTS - ADMOR HVAC'S FAILURE TO PAY RENT, FAILURE TO PAY RENT TIMELY, AND/OR FAILURE TO PAY LATE PENALTIES AND INTEREST FROM 2012-2014)

38

272.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 271 of the Complaint as though fully set forth herein.

273.    Alternatively, Union Leasing is entitled to recover damages under the theory of unjust enrichment.

274.    Admor HVAC's failure to make timely payments resulted in a benefit to Admor HVAC to the detriment of Union Leasing.

275.    From 2012-2014, Admor HVAC enjoyed the use of the Premises without making timely payment of rent in eleven (11) of the thirty-six (36) months.

276.    As a result of these late and deficient payments, Union Leasing is entitled to damages, including interest at the statutory rate, in an amount to be proven at trial.

277.    Defendants Admor Group, Admor Distributors, and Admor HVAC should be jointly and severally liable for said damages because of their common control and interest.

## COUNT XVII –BREACH OF ORAL CONTRACT
### (AS TO ALL DEFENDANTS - ADMOR HVAC'S FAILURE TO MAKE MONTHLY TRUCK LEASE PAYMENTS FROM MAY 2010 TO PRESENT)

278.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 277 of the Complaint as though fully set forth herein.

279.    Admor HVAC has breached the terms of its oral contract with Union Leasing to lease trucks owned by Union Leasing for $3,000 a month.

280.    Admor HVAC has not made payment on these truck leases since May 2010.

281.    Therefore, Admor HVAC has failed to pay Union Leasing over $177,000.00 of principal payments.

282.    Plaintiff is entitled to payment of the lease amounts that have not been

paid since May 2010 plus interest in an amount to be proven at trial.

283.    Defendants Admor Group, Admor Distributors, and Admor HVAC should

be jointly and severally liable for said amount because of their common control and interest.

## COUNT XVIII –UNJUST ENRICHMENT
(AS TO ALL DEFENDANTS - ADMOR HVAC'S FAILURE TO MAKE MONTHLY TRUCK
LEASE PAYMENTS FROM MAY 2010 TO PRESENT)

284.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs

1 through 283 of the Complaint as though fully set forth herein.

285.    Alternatively, Union Leasing is entitled to recover damages under the

theory of unjust enrichment.

286.    Admor HVAC has failed to pay for its continued use of the Union Leasing

trucks since May 2010.

287.    Therefore, Admor HVAC has been unjustly enriched by having complete

and unfettered access, use, and control of the trucks without having to pay for the value of said

trucks.

288.    Plaintiff is entitled to restitution of the benefit conferred upon Admor

HVAC since May 2010 for which Admor HVAC failed to repay in an amount to be proven at

trial.

289.    Defendants Admor Group, Admor Distributors, and Admor HVAC should

be jointly and severally liable for the benefit conferred because of their common control and

interest.

## VI. **PRAYER FOR RELIEF**

Wherefore, based on the foregoing, Plaintiff respectfully requests this Honorable Court grant the following requests for relief:

A.    As to Counts I and II: That the Court award Plaintiff judgment against the Defendants Admor Group, Admor Distributors, and Admor HVAC, jointly and severally, for back rent due and interest at the statutory legal rate of 10% which Admor Distributors owes to Union Leasing for period 2008-2009 in an amount to be proven at trial under the theory of breach of oral contract or unjust enrichment;

B.    As to Counts III and IV: That the Court award Plaintiff judgment against the Defendants Admor Group, Admor Distributors, and Admor HVAC, jointly and severally, for back rent due, late fees, and interest at the statutory legal rate of 10% which Admor Distributors owes to Union Leasing for period 2010 in an amount to be proven at trial under the theory of breach of contract or unjust enrichment;

C.    As to Counts V and VI: That the Court award Plaintiff judgment against the Defendants Admor Group, Admor Distributors, and Admor HVAC, jointly and severally, for back rent due, late fees, and interest at the statutory legal rate of 10% which Admor Distributors owes to Union Leasing for period 2011 in an amount to be proven at trial under the theory of breach of contract or unjust enrichment;

D.    As to Counts VII and VIII: That the Court award Plaintiff judgment against the Defendants Admor Group, Admor Distributors, and Admor

HVAC, jointly and severally, for back rent due, late fees, and interest at the statutory legal rate of 10% which Admor Distributors owes to Union Leasing for period 2012-2014, plus any additional back rent, late fees, and interest accrued since the end of 2014 in an amount to be proven at trial under the theory of breach of contract or unjust enrichment;

E.  As to Counts IX and X: That the Court award Plaintiff judgment against the Defendants Admor Group, Admor Distributors, and Admor HVAC, jointly and severally, for back rent due and interest at the statutory legal rate of 10% which Admor HVAC owes to Union Leasing for period 2008-2009 in an amount to be proven at trial under the theory of breach of oral contract or unjust enrichment;

F.  As to Counts XI and XII: That the Court award Plaintiff judgment against the Defendants Admor Group, Admor Distributors, and Admor HVAC, jointly and severally, for back rent due, late fees, and interest at the statutory legal rate of 10% which Admor HVAC owes to Union Leasing for period 2010 in an amount to be proven at trial under the theory of breach of contract or unjust enrichment;

G.  As to Counts XIII and XIV: That the Court award Plaintiff judgment against the Defendants Admor Group, Admor Distributors, and Admor HVAC, jointly and severally, for back rent due, late fees, and interest at the statutory legal rate of 10% which Admor HVAC owes to Union Leasing for period 2011 in an amount to be proven at trial under the theory of breach of contract or unjust enrichment;

42

H.   As to Counts XV and XVI: That the Court award Plaintiff judgment against the Defendants Admor Group, Admor Distributors, and Admor HVAC, jointly and severally, for back rent due, late fees, and interest at the statutory legal rate of 10% which Admor HVAC owes to Union Leasing for period 2012-2014, plus any additional back rent, late fees, and interest accrued since the end of 2014 in an amount to be proven at trial under the theory of breach of contract or unjust enrichment;

I.   As to Counts XVII and XVIII: That the Court award Plaintiff judgment against the Defendants Admor Group, Admor Distributors, and Admor HVAC, jointly and severally, for lease payments due and interest at the statutory legal rate of 10% which Admor HVAC owes to Union Leasing for period May 2010 – March 2015, plus any additional lease payments and interest accrued since the end of March 2015 in an amount to be proven at trial under the theory of breach of oral contract or unjust enrichment;

J.   As to all Counts: That this Court award Plaintiff its attorneys' fees and costs; and

K.   As to all Counts: That this Court grants any and all other relief, as it deems just.

DATED: Honolulu, Hawaii;    APR 13 2015     .

_____

MICHAEL D. RUDY
CHERYL R. NG
PAUL A. C. HIGA
Attorneys for Plaintiff

43

ADNOR
DIST.

# Commercial Lease

This Lease is made on ____January 4, 2010____ , between ____Union Leasing Corp.____ ,
Landlord, of ____2225 Hoonee Place_____ , City of
____Honolulu_____ , State of _____Hawaii_____ , and
____Adnor Distributors Corp.____ , Tenant, of ____a portion of 2225 Hoonee Place____ ,
City of ____Honolulu_____ , State of ____Hawaii_____ .

1. The Landlord agrees to rent to the Tenant and the Tenant agrees to rent from the Landlord the following
property:        as stated above

2. The rental payments will be $ ____6,865.00_____ per month and will be payable by the Tenant to the Land-
lord on the __1st__ day of each month, beginning on ____January 4, 2010_____ . If any rental pay-
ment is not paid within five (5) days of its due date, the Tenant agrees to pay an additional late charge of 5% (five
percent) of the rental payment due.

3. The term of this Lease will be from ____January 4, 2010_____ , until ____December 31, 2010__ If Tenant
is in full compliance with all of the terms of this Lease at the expiration of this term, Tenant shall have the option
to renew this Lease for an additional term of ____one (1) year_____ , with all terms and conditions of
this Lease remaining the same, except that the rent shall be $ ____N/A_____ . If the Tenant remains
as tenant after the expiration of this Lease with the consent of the Landlord but without signing a new lease, a
month-to month tenancy will be created with the same terms and conditions as this Lease, except that such new
tenancy may be terminated by ninety (90) days written notice from either the Tenant or the Landlord, and that the
rent shall be $ ____N/A_____ .

4. The Tenant has paid the Landlord a security deposit of $ ____N/A_____ . This security deposit
will be held as security for the repair of any damages to the property by the Tenant. This deposit will be returned
to the Tenant within ten (10) days of the termination of this Lease, minus any amounts needed to repair the prop-
erty, but without interest.

5. The Tenant has paid the Landlord an additional month's rent in the amount of $ ____N/A_____ .
This rent deposit will be held as security for the payment of rent by the Tenant. This rent payment deposit will be
returned to the Tenant within ten (10) days of the termination of this Lease, minus any rent still due upon termina-
tion, but without interest.

☆NOVA Commercial Lease Pg.1 (01-09)

6. The Tenant agrees to use the property only for the purpose of carrying on the following lawful business:

Sale of home appliances, air conditioners and related items

7. The Landlord agrees that the Tenant may install the following equipment and fixtures for the purpose of operating the Tenant's business and that such equipment and fixtures shall remain the property of the Tenant:

N/A

8. The Tenant has inspected the property and has found it satisfactory for its intended purposes. The Landlord shall be responsible for the repair and upkeep of the exterior of the property, including the roof, exterior walls, parking areas, landscaping, and building foundation. The Tenant shall be responsible for the repair and upkeep of the interior of the property, including all electrical, mechanical, plumbing, heating, cooling, or any other system or equipment on the property. Tenant agrees to maintain the interior of the property and the surrounding outside area in a clean, safe, and sanitary manner and to not make any alterations to the property without the Landlord's written consent. At the termination of this Lease, the Tenant agrees to leave the property in the same condition as when it was received, except for normal wear and tear. Tenant also agrees to comply with all rules, laws, regulations, and ordinances affecting the property or the business activities of the Tenant.

9. The Tenant agrees to obtain and pay for all necessary utilities for the property.

10. The Tenant agrees not to sub-let the property or assign this Lease without the Landlord's written consent, which shall not be unreasonably withheld. Tenant agrees to allow the Landlord reasonable access to the property for inspection and repair. Landlord agrees to enter the property only after notifying the Tenant in advance, except in an emergency.

11. If the Tenant fails to pay the rent on time or violates any other terms of this Lease, the Landlord will provide written notice of the violation or default, allowing ___15___ days to correct the violation or default. If the violation or default is not completely corrected within the time prescribed, the Landlord will have the right to terminate this Lease with ___15___ days notice and in accordance with state law. Upon termination of this Lease, the Tenant agrees to surrender possession of the property. The Landlord will also have the right to re-enter the property and take possession of it, remove Tenant and any equipment or possessions of Tenant, and to take advantage of any other legal remedies available.

12. The Landlord agrees to carry fire and casualty insurance on the property, but shall have no liability for the operation of the Tenant's business. The Tenant agrees not to do anything that will increase the Landlord's insurance premiums and, further agrees to indemnify and hold the Landlord harmless from any liability or damage, whether caused by Tenant's operations or otherwise. The Tenant agrees to carry and pay all premiums for casualty insurance on any equipment or fixtures that Tenant installs at the property. In addition, the Tenant agrees to carry business liability insurance, including bodily injury and property damage coverage, covering all Tenant's business operations in the amount of $ 4,381,300.00 (COMBINED LIMIT FOR AD/MOR DIST. + AD/MOR HVAC) with the Landlord named as a co-insured party. Tenant agrees to furnish Landlord copies of the insurance policies and to not cancel the policies without notifying the Landlord in advance. Tenant agrees to provide Landlord with a Certificate of Insurance which indicates that Landlord is a co-insured party and that Landlord shall be provided with a minimum of ten (10) days written notice prior to cancellation or change of coverage.

13. This Lease is subject to any mortgage or deed of trust currently on the property or which may be made against the property at any time in the future. The Tenant agrees to sign any documents necessary to subordinate this Lease to a mortgage or deed of trust for the Landlord.

14. This Lease may only be terminated by __N/A__ days written notice from either party, except in the event of a violation of any terms or default of any payments or responsibilities due under this Lease, which are governed by the terms in Paragraph 11 of this Lease.

15. Tenant agrees that if any legal action is necessary to recover the property, collect any amounts due under this Lease, or correct a violation of any term of this Lease, Tenant shall be responsible for all costs incurred by Landlord in connection with such action, including any reasonable attorney's fees.

16. As required by law, the Landlord makes the following statement: "Radon gas is a naturally-occurring radioactive gas that, when accumulated in sufficient quantities in a building, may present health risks to persons exposed to it. Levels of radon gas that exceed federal and state guidelines have been found in buildings in this state. Additional information regarding radon gas and radon gas testing may be obtained from your county health department".

17. The following are additional terms of this Lease:

    Tenant agrees to occupy space(s) with other tenants

18. The parties agree that this Lease, including the following attachments:

    N/A

is the entire agreement between them and that no terms of this Lease may be changed except by written agreement of both parties. This Lease is intended to comply with any and all applicable laws relating to landlord and tenant relationships in this state. This Lease binds and benefits both the Landlord and Tenant and any heirs, successors, representatives, or assigns. This Lease is governed by the laws of the State of __Hawaii__ .

_____          _____
Signature of Landlord                       Signature of Tenant


JOANNE LITTLE                              PATRICK W. MURPHY
_____          _____
Name of Landlord                            Name of Tenant


☆NOVA Commercial Lease Pg.2 (01-09)

# Commercial Lease

This Lease is made on February 8, 2010 , between Union Leasing Corp. ,
Landlord, of 2225 Hoonee Place , City of
Honolulu , State of Hawaii , and
Admor Distributors Corp. , Tenant, of a portion of 2225 Hoonee Place ,
City of Honolulu , State of Hawaii .

1. The Landlord agrees to rent to the Tenant and the Tenant agrees to rent from the Landlord the following property:

AS STATED ABOVE.

2. The rental payments will be $ 6,521.75 per month and will be payable by the Tenant to the Landlord on the 1st day of each month, beginning on January 1, 2011 . If any rental payment is not paid within five (5) days of its due date, the Tenant agrees to pay an additional late charge of 5% (five percent) of the rental payment due.

3. The term of this Lease will be from January 1, 2011 , until December 31, 2011 . If Tenant is in full compliance with all of the terms of this Lease at the expiration of this term, Tenant shall have the option to renew this Lease for an additional term of one (1) year , with all terms and conditions of this Lease remaining the same, except that the rent shall be $ N/A . If the Tenant remains as tenant after the expiration of this Lease with the consent of the Landlord but without signing a new lease, a month-to-month tenancy will be created with the same terms and conditions as this Lease, except that such new tenancy may be terminated by ninety (90) days written notice from either the Tenant or the Landlord, and that the rent shall be $ N/A .

4. The Tenant has paid the Landlord a security deposit of $ N/A . This security deposit will be held as security for the repair of any damages to the property by the Tenant. This deposit will be returned to the Tenant within ten (10) days of the termination of this Lease, minus any amounts needed to repair the property, but without interest.

5. The Tenant has paid the Landlord an additional month's rent in the amount of $ N/A . This rent deposit will be held as security for the payment of rent by the Tenant. This rent payment deposit will be returned to the Tenant within ten (10) days of the termination of this Lease, minus any rent still due upon termination, but without interest.

☆NOVA Commercial Lease Pg.1 (01-09)

6. The Tenant agrees to use the property only for the purpose of carrying on the following lawful business:

*SALE OF HOME APPLIANCES, AIR CONDITIONERS AND RELATED ITEMS*

7. The Landlord agrees that the Tenant may install the following equipment and fixtures for the purpose of operating the Tenant's business and that such equipment and fixtures shall remain the property of the Tenant:

*N/A*

8. The Tenant has inspected the property and has found it satisfactory for its intended purposes. The Landlord shall be responsible for the repair and upkeep of the exterior of the property, including the roof, exterior walls, parking areas, landscaping, and building foundation. The Tenant shall be responsible for the repair and upkeep of the interior of the property, including all electrical, mechanical, plumbing, heating, cooling, or any other system or equipment on the property. Tenant agrees to maintain the interior of the property and the surrounding outside area in a clean, safe, and sanitary manner and not to make any alterations to the property without the Landlord's written consent. At the termination of this Lease, the Tenant agrees to leave the property in the same condition as when it was received, except for normal wear and tear. Tenant also agrees to comply with all rules, laws, regulations, and ordinances affecting the property or the business activities of the Tenant.

9. The Tenant agrees to obtain and pay for all necessary utilities for the property.

10. The Tenant agrees not to sub-let the property or assign this Lease without the Landlord's written consent, which shall not be unreasonably withheld. Tenant agrees to allow the Landlord reasonable access to the property for inspection and repair. Landlord agrees to enter the property only after notifying the Tenant in advance, except in an emergency.

11. If the Tenant fails to pay the rent on time or violates any other terms of this Lease, the Landlord will provide written notice of the violation or default, allowing ___15___ days to correct the violation or default. If the violation or default is not completely corrected within the time prescribed, the Landlord will have the right to terminate this Lease with ___15___ days notice and in accordance with state law. Upon termination of this Lease, the Tenant agrees to surrender possession of the property. The Landlord will also have the right to re-enter the property and take possession of it, remove Tenant and any equipment or possessions of Tenant, and to take advantage of any other legal remedies available.

12. The Landlord agrees to carry fire and casualty insurance on the property, but shall have no liability for the operation of the Tenant's business. The Tenant agrees not to do anything that will increase the Landlord's insurance premiums and, further agrees to indemnify and hold the Landlord harmless from any liability or damage, whether caused by Tenant's operations or otherwise. The Tenant agrees to carry and pay all premiums for casualty insurance on any equipment or fixtures that Tenant installs at the property. In addition, the Tenant agrees to carry business liability insurance, including bodily injury and property damage coverage, covering all Tenant's business operations in the amount of $ 4,381,300.00 *(COMBINED LIMIT FOR ADMOR DIST, + ADMOR HVAC)* with the Landlord named as a co-insured party. Tenant agrees to furnish Landlord copies of the insurance policies and to not cancel the policies without notifying the Landlord in advance. Tenant agrees to provide Landlord with a Certificate of Insurance which indicates that Landlord is a co-insured party and that Landlord shall be provided with a minimum of ten (10) days written notice prior to cancellation or change of coverage.

13. This Lease is subject to any mortgage or deed of trust currently on the property or which may be made against the property at any time in the future. The Tenant agrees to sign any documents necessary to subordinate this Lease to a mortgage or deed of trust for the Landlord.

14. This Lease may only be terminated by _N/A_ days written notice from either party, except in the event of a violation of any terms or default of any payments or responsibilities due under this Lease, which are governed by the terms in Paragraph 11 of this Lease.

15. Tenant agrees that if any legal action is necessary to recover the property, collect any amounts due under this Lease, or correct a violation of any term of this Lease, Tenant shall be responsible for all costs incurred by Landlord in connection with such action, including any reasonable attorney's fees.

16. As required by law, the Landlord makes the following statement: "Radon gas is a naturally-occurring radioactive gas that, when accumulated in sufficient quantities in a building, may present health risks to persons exposed to it. Levels of radon gas that exceed federal and state guidelines have been found in buildings in this state. Additional information regarding radon gas and radon gas testing may be obtained from your county health department".

17. The following are additional terms of this Lease:

TENANT AGREES TO OCCUPY SPACE(S) WITH OTHER TENANTS

18. The parties agree that this Lease, including the following attachments:

N/A

is the entire agreement between them and that no terms of this Lease may be changed except by written agreement of both parties. This Lease is intended to comply with any and all applicable laws relating to landlord and tenant relationships in this state. This Lease binds and benefits both the Landlord and Tenant and any heirs, successors, representatives, or assigns. This Lease is governed by the laws of the State of _Hawaii_ .

_____
Signature of Landlord

_____
Signature of Tenant

Joanne Little
Name of Landlord

Patrick W. Murphy
Name of Tenant

☆NOVA Commercial Lease Pg.2 (01-09)

*HVAC* (handwritten)

# Commercial Lease

This Lease is made on ___January 4, 2010___ , between ___Union Leasing Corp.___ ,
Landlord, of ___2225 Hoonee Place_____ , City of
___Honolulu_____ , State of ___Hawaii_____ , and
___Admor HVAC_____ , Tenant, of ___a portion of 2225 Honnee Place___ ,
City of ___Honolulu_____ , State of ___Hawaii_____ .

1. The Landlord agrees to rent to the Tenant and the Tenant agrees to rent from the Landlord the following
property: ___as stated above___

2. The rental payments will be $ __38,900_____ per month and will be payable by the Tenant to the Land-
lord on the __1st__ day of each month, beginning on ___January 4, 2010_____ . If any rental pay-
ment is not paid within five (5) days of its due date, the Tenant agrees to pay an additional late charge of 5% (five
percent) of the rental payment due.

3. The term of this Lease will be from ___January 4, 2010__ , until ___December 31, 2010__. If Tenant
is in full compliance with all of the terms of this Lease at the expiration of this term, Tenant shall have the option
to renew this Lease for an additional term of ___one (1) year_____ , with all terms and conditions of
this Lease remaining the same, except that the rent shall be $ ___N/A_____ . If the Tenant remains
as tenant after the expiration of this Lease with the consent of the Landlord but without signing a new lease, a
month-to-month tenancy will be created with the same terms and conditions as this Lease, except that such new
tenancy may be terminated by ninety (90) days written notice from either the Tenant or the Landlord, and that the
rent shall be $ __N/A_____ .

4. The Tenant has paid the Landlord a security deposit of $ ___N/A_____ . This security deposit
will be held as security for the repair of any damages to the property by the Tenant. This deposit will be returned
to the Tenant within ten (10) days of the termination of this Lease, minus any amounts needed to repair the prop-
erty, but without interest.

5. The Tenant has paid the Landlord an additional month's rent in the amount of $ ___N/A_____ .
This rent deposit will be held as security for the payment of rent by the Tenant. This rent payment deposit will be
returned to the Tenant within ten (10) days of the termination of this Lease, minus any rent still due upon termina-
tion, but without interest.

**Exhibit "C"**

6. The Tenant agrees to use the property only for the purpose of carrying on the following lawful business:

    Sale of HVAC products and accessories

7. The Landlord agrees that the Tenant may install the following equipment and fixtures for the purpose of operating the Tenant's business and that such equipment and fixtures shall remain the property of the Tenant:

    N/A

8. The Tenant has inspected the property and has found it satisfactory for its intended purposes. The Landlord shall be responsible for the repair and upkeep of the exterior of the property, including the roof, exterior walls, parking areas, landscaping, and building foundation. The Tenant shall be responsible for the repair and upkeep of the interior of the property, including all electrical, mechanical, plumbing, heating, cooling, or any other system or equipment on the property. Tenant agrees to maintain the interior of the property and the surrounding outside area in a clean, safe, and sanitary manner and not to make any alterations to the property without the Landlord's written consent. At the termination of this Lease, the Tenant agrees to leave the property in the same condition as when it was received, except for normal wear and tear. Tenant also agrees to comply with all rules, laws, regulations, and ordinances affecting the property or the business activities of the Tenant.

9. The Tenant agrees to obtain and pay for all necessary utilities for the property.

10. The Tenant agrees not to sub-let the property or assign this Lease without the Landlord's written consent, which shall not be unreasonably withheld. Tenant agrees to allow the Landlord reasonable access to the property for inspection and repair. Landlord agrees to enter the property only after notifying the Tenant in advance, except in an emergency.

11. If the Tenant fails to pay the rent on time or violates any other terms of this Lease, the Landlord will provide written notice of the violation or default, allowing ___15___ days to correct the violation or default. If the violation or default is not completely corrected within the time prescribed, the Landlord will have the right to terminate this Lease with ___15___ days notice and in accordance with state law. Upon termination of this Lease, the Tenant agrees to surrender possession of the property. The Landlord will also have the right to re-enter the property and take possession of it, remove Tenant and any equipment or possessions of Tenant, and to take advantage of any other legal remedies available.

12. The Landlord agrees to carry fire and casualty insurance on the property, but shall have no liability for the operation of the Tenant's business. The Tenant agrees not to do anything that will increase the Landlord's insurance premiums and, further agrees to indemnify and hold the Landlord harmless from any liability or damage, whether caused by Tenant's operations or otherwise. The Tenant agrees to carry and pay all premiums for casualty insurance on any equipment or fixtures that Tenant installs at the property. In addition, the Tenant agrees to carry business liability insurance, including bodily injury and property damage coverage, covering all Tenant's business operations in the amount of $ _4,381,300.00_ (COMBINED LIMIT FOR ADMOR DIST. + ADMOR HVAC) with the Landlord named as a co-insured party. Tenant agrees to furnish Landlord copies of the insurance policies and to not cancel the policies without notifying the Landlord in advance. Tenant agrees to provide Landlord with a Certificate of Insurance which indicates that Landlord is a co-insured party and that Landlord shall be provided with a minimum of ten (10) days written notice prior to cancellation or change of coverage.

13. This Lease is subject to any mortgage or deed of trust currently on the property or which may be made against the property at any time in the future. The Tenant agrees to sign any documents necessary to subordinate this Lease to a mortgage or deed of trust for the Landlord.

14. This Lease may only be terminated by ___N/A___ days written notice from either party, except in the event of a violation of any terms or default of any payments or responsibilities due under this Lease, which are governed by the terms in Paragraph 11 of this Lease.

15. Tenant agrees that if any legal action is necessary to recover the property, collect any amounts due under this Lease, or correct a violation of any term of this Lease, Tenant shall be responsible for all costs incurred by Landlord in connection with such action, including any reasonable attorney's fees.

16. As required by law, the Landlord makes the following statement: "Radon gas is a naturally-occurring radioactive gas that, when accumulated in sufficient quantities in a building, may present health risks to persons exposed to it. Levels of radon gas that exceed federal and state guidelines have been found in buildings in this state. Additional information regarding radon gas and radon gas testing may be obtained from your county health department".

17. The following are additional terms of this Lease:

    Tenant agrees to occupy space(s) with other tenants.

18. The parties agree that this Lease, including the following attachments:

    N/A

is the entire agreement between them and that no terms of this Lease may be changed except by written agreement of both parties. This Lease is intended to comply with any and all applicable laws relating to landlord and tenant relationships in this state. This Lease binds and benefits both the Landlord and Tenant and any heirs, successors, representatives, or assigns. This Lease is governed by the laws of the State of __Hawaii_____.

_____          _____
Signature of Landlord                     Signature of Tenant


JOANNE LITTLE                             ANDREW SANTOS
_____          _____
Name of Landlord                          Name of Tenant

# Commercial Lease

This Lease is made on February 8, 2010 , between Union Leasing Corp. ,
Landlord, of 2225 Hoonee Place , City of
Honolulu , State of Hawaii , and
Admor HVAC Products, Inc. , Tenant, of a portion of 2225 Hoonee Place ,
City of Honolulu , State of Hawaii .

1. The Landlord agrees to rent to the Tenant and the Tenant agrees to rent from the Landlord the following
property:   AS STATED ABOVE.

2. The rental payments will be $ 36,955.00 per month and will be payable by the Tenant to the Land-
lord on the 1st day of each month, beginning on January 1, 2011 . If any rental pay-
ment is not paid within five (5) days of its due date, the Tenant agrees to pay an additional late charge of 5% (five
percent) of the rental payment due.

3. The term of this Lease will be from January 1, 2011 , until December 31, 2011 . If Tenant
is in full compliance with all of the terms of this Lease at the expiration of this term, Tenant shall have the option
to renew this Lease for an additional term of one (1) year , with all terms and conditions of
this Lease remaining the same, except that the rent shall be $ N/A . If the Tenant remains
as tenant after the expiration of this Lease with the consent of the Landlord but without signing a new lease, a
month-to-month tenancy will be created with the same terms and conditions as this Lease, except that such new
tenancy may be terminated by ninety (90) days written notice from either the Tenant or the Landlord, and that the
rent shall be $ N/A .

4. The Tenant has paid the Landlord a security deposit of $ N/A . This security deposit
will be held as security for the repair of any damages to the property by the Tenant. This deposit will be returned
to the Tenant within ten (10) days of the termination of this Lease, minus any amounts needed to repair the prop-
erty, but without interest.

5. The Tenant has paid the Landlord an additional month's rent in the amount of $ N/A .
This rent deposit will be held as security for the payment of rent by the Tenant. This rent payment deposit will be
returned to the Tenant within ten (10) days of the termination of this Lease, minus any rent still due upon termina-
tion, but without interest.

★NOVA Commercial Lease Pg.1 (01-09)

**Exhibit "D"**

6. The Tenant agrees to use the property only for the purpose of carrying on the following lawful business:

SALE OF HVAC PRODUCTS AND ACCESSORIES

7. The Landlord agrees that the Tenant may install the following equipment and fixtures for the purpose of operating the Tenant's business and that such equipment and fixtures shall remain the property of the Tenant:

N/A

8. The Tenant has inspected the property and has found it satisfactory for its intended purposes. The Tenant shall be responsible for the repair and upkeep of the exterior of the property, including the roof, exterior walls, parking areas, landscaping, and building foundation. The Tenant shall be responsible for the repair and upkeep of the interior of the property, including all electrical, mechanical, plumbing, heating, cooling, or any other system or equipment on the property. Tenant agrees to maintain the interior of the property and the surrounding outside area in a clean, safe, and sanitary manner and not to make any alterations to the property without the Landlord's written consent. At the termination of this Lease, the Tenant agrees to leave the property in the same condition as when it was received, except for normal wear and tear. Tenant also agrees to comply with all rules, laws, regulations, and ordinances affecting the property or the business activities of the Tenant.

9. The Tenant agrees to obtain and pay for all necessary utilities for the property.

10. The Tenant agrees not to sub-let the property or assign this Lease without the Landlord's written consent, which shall not be unreasonably withheld. Tenant agrees to allow the Landlord reasonable access to the property for inspection and repair. Landlord agrees to enter the property only after notifying the Tenant in advance, except in an emergency.

11. If the Tenant fails to pay the rent on time or violates any other terms of this Lease, the Landlord will provide written notice of the violation or default, allowing ___15___ days to correct the violation or default. If the violation or default is not completely corrected within the time prescribed, the Landlord will have the right to terminate this Lease with __15__ days notice and in accordance with state law. Upon termination of this Lease, the Tenant agrees to surrender possession of the property. The Landlord will also have the right to re-enter the property and take possession of it, remove Tenant and any equipment or possessions of Tenant, and to take advantage of any other legal remedies available.

12. The Landlord agrees to carry fire and casualty insurance on the property, but shall have no liability for the operation of the Tenant's business. The Tenant agrees not to do anything that will increase the Landlord's insurance premiums and, further agrees to indemnify and hold the Landlord harmless from any liability or damage, whether caused by Tenant's operations or otherwise. The Tenant agrees to carry and pay all premiums for casualty insurance on any equipment or fixtures that Tenant installs at the property. In addition, the Tenant agrees to carry business liability insurance, including bodily injury and property damage coverage, covering all Tenant's business operations in the amount of $ 4,381,300.00 _____ with the Landlord named as a co-insured party. (COMBINED LIMIT FOR ADMOR DIST. + ADMOR HVAC) Tenant agrees to furnish Landlord copies of the insurance policies and to not cancel the policies without notifying the Landlord in advance. Tenant agrees to provide Landlord with a Certificate of Insurance which indicates that Landlord is a co-insured party and that Landlord shall be provided with a minimum of ten (10) days written notice prior to cancellation or change of coverage.

13. This Lease is subject to any mortgage or deed of trust currently on the property or which may be made against the property at any time in the future. The Tenant agrees to sign any documents necessary to subordinate this Lease to a mortgage or deed of trust for the Landlord.

14. This Lease may only be terminated by N/A days written notice from either party, except in the event of a violation of any terms or default of any payments or responsibilities due under this Lease, which are governed by the terms in Paragraph 11 of this Lease.

15. Tenant agrees that if any legal action is necessary to recover the property, collect any amounts due under this Lease, or correct a violation of any term of this Lease, Tenant shall be responsible for all costs incurred by Landlord in connection with such action, including any reasonable attorney's fees.

16. As required by law, the Landlord makes the following statement: "Radon gas is a naturally-occurring radioactive gas that, when accumulated in sufficient quantities in a building, may present health risks to persons exposed to it. Levels of radon gas that exceed federal and state guidelines have been found in buildings in this state. Additional information regarding radon gas and radon gas testing may be obtained from your county health department".

17. The following are additional terms of this Lease:

TENANT AGREES TO OCCUPY SPACE (s) WITH OTHER TENANTS.

18. The parties agree that this Lease, including the following attachments:

N/A.

is the entire agreement between them and that no terms of this Lease may be changed except by written agreement of both parties. This Lease is intended to comply with any and all applicable laws relating to landlord and tenant relationships in this state. This Lease binds and benefits both the Landlord and Tenant and any heirs, successors, representatives, or assigns. This Lease is governed by the laws of the State of Hawaii .

Signature of Landlord                                    Signature of Tenant


Joanne Little                                            Andrew Santos
Name of Landlord                                         Name of Tenant


☆NOVA Commercial Lease Pg.2 (01-09)